Zell v. Petitioner, Mr. Hinchelwood for the respondent. Good morning, Your Honors. May it please the Court. My name is Mark Zell. My colleague Noam Schreiber, Advocate, and I have come here from Jerusalem on behalf of Petitioner Nadia Pinkovich Matar, an Israeli and Belgian dual national who has resided in Israel for several decades, together with her American husband, David Matar, and her six children and a bunch of grandchildren. Unfortunately, as much as she would have liked, Nadia Matar cannot be here today because her name may or may not appear on a federal watch list, most specifically the no-fly list. Your Honors, Congress authorized the Executive Branch through the Respondent, Transportation, and Security Administration to create and administer an advanced passenger pre-screening system, and with it the no-fly list, to protect this country from terror and other national security threats. Ms. Matar, and I have to emphasize this, has not and has never been a terrorist, nor is it even conceivable that she could be considered a national security threat. I've known her for 30-odd years. To be clear, neither this petition nor the TSA Trip Travel and Address Inquiry Program that we're discussing here today has to determine whether Ms. Matar is a terrorist or whether she is properly considered a national security threat. No. Ms. Matar initiated this proceeding, Your Honors, for the sole purpose of learning whether her name is or ever was on a federal watch list, and Your Honors, if so, just a simple explanation as to how that could have occurred, so that she might at some point decide whether or not she can take remedial action to correct what she would consider, and I would consider, a serious injustice. Now, Your Honors, Congress I'm going to start you on something that's a little more boring, unfortunately, which is the date on which the petition was filed. So there's a 60-day period. I think everybody understands there's a 60-day period. Correct. And everybody also understands that it was filed exactly two days beyond the 60 days, depending how you calculate the date that the 60-day period runs, Your Honor. And that's what we've discussed here. Judge Henderson wrote, in her opinion, in Navia Dynamics, I think the definitive interpretation of what the section 46.110, what it says in terms of the beginning of this 60-day period, that period runs when the agency action has issued. Now, what does that mean? Does it mean, as the government apparently contends in this case, that it's the date that actually petitioner received that, actually got notice of this proceeding on August 13th, or the date, as some have suggested, when the decision was mailed by the TSA? Now, I don't want to, you know, burden the Court today with an elaborate, esoteric discussion about actual notice and private communications. We've discussed that in our brief. Let us assume, for the sake of this discussion today, that the appropriate standard is, as the First and Eleventh Circuits have suggested, that the 60-day period runs when the decision is sent, that is, mailed. Now, we have a curious position by the TSA on this. That, by the way, the Court can take judicial notice of the fact that the decision, the date of the decision, the actual non-response, the issuer in this case, is 28 July 2017. That was a Friday. Now, Your Honors, the TSA has yet to provide us with any information, any clue, as to when that decision was actually mailed. Because if it was mailed, for example, on the next workday, which I believe was a Monday, then the 60-day period would have run from that time, and, Your Honors, we would have been within the 60-day period when we filed our petition for review on September 28, 2017. Now, what is it the TSA would have told us? Right? Postmark would have told us. And what does the TSA tell us about this? Because we can't find the envelope, the client who received the document. By the way, it was never sent to me. You'll notice from the record, I was listed in, and it was very clear to the TSA that I was attorney of record in this case from the very beginning. I'm not even listed on any of their preliminary documents. And they never bothered to send the letter to me. So I could have preserved a postmark, which I normally would do in my office. But I'll tell you, what happened in this case is the petitioner discarded the envelope, and the government is saying, well, you don't have the envelope. You haven't met your burden to prove you met the 60-day rule. Well, I think that's a little bit backwards, Your Honors. I think the proper approach in this case is that where the party that has control of the information, and they should know when they mail a decision. They should have a record in it, just like the Fourth Circuit case that they cite in their brief on the Skyline Drives case, where the FAA was, had an elaborate system of recording and entering exactly when their decisions were not only entered but mailed. And they even issued certificates to that effect. Now, I bet, I bet anything that the TSA does have such a record. And the fact that they haven't produced it in this case, information that they, because there, the repositories of the information did not preserve or not present to this Court, I think there's an inference that they did not mail that decision on that Friday and may have mailed subsequent to that, in which case we're okay under the 60-day rule. But even if, and again, we, time is limited, so I, with your permission, I'll move on to the merits of the case. Your Honors, and Judge Edwards, in his opinion, two opinions really, one in Olivares and the other in Emeraget, made it very clear that under the Administrative Procedure Act, it is the solemn duty of the end, of a federal agency to articulate the recipient can understand the basis for the reasoning, if any, by the agency and take remedial action. Your Honors have read the letter in this case, a standard form letter that the TSA routinely distributes to all applicants under the TRIP program. And that letter is a non-letter. It says absolutely nothing. Now, Your Honors, that does not comport with Section 555 of Title V under the Administrative Procedure Act. It doesn't constitute proper decision-making, in fact, arbitrary and capricious under Section 706. It's hard to say it says nothing because it at least tells you that, or your client, it at least tells the audience that the request was received and that, to the extent that there had to have been actions taken necessary in response to it, that those actions were taken. I mean, it does tell you something. Now, I know you think that that's not much. Well, I think that's not only not much, I think that's nothing. Particularly, Your Honor, when you consider the considerable effort to which Congress went to emphasize the importance of offering a system of redress for persons who agree, believe that they are aggrieved by this system, by this watchlist system. And can you tell us what exactly, so there's been several kind of injuries that have been spelled out in the briefing. What's the injury? I think the key issue, there are several, all of which would sustain standing under Article III for the petitioner in this case. But the key one is informational injury. Because these statutes, and there are four of them, no less than four under the various statutes at issue in this case in which Congress has mandated that the agency adopt a system for redress to allow persons who believe that they're injured to appeal. That's the language of the statutes. And it appears four times. Does it ever include anyone other than a U.S. citizen or a permanent legal resident? It does not, and that's an excellent question, because it doesn't distinguish at all between U.S. citizens or U.S. persons and foreign claimants, at all. And Congress does know how to do that. I mean, we know, for example, under the Privacy Act, all right, that Congress made a very clear determination that individuals, only individuals who are U.S. persons can make, take advantage of that statute. But in this one, absolutely no determination, no distinction was made by Congress between foreign national travelers and U.S. person travelers. Now, TSA, in its inimitable wisdom, and this is important, because in response to litigation that has been spawned around the country in the Ninth Circuit and the Sixth Circuit and the Fourth Circuit, the TSA changed its policy here and specifically authorized the release of the very information that Nadia Mattar, in this case, is requesting. Is she on the list? Was she ever on the list? And a simple reason why. Which is the statutory language that actually entitles somebody to know that? Because there's statutory language that entitles, that at least creates a regime under which a person can appeal a determination and seek to have information corrected. But I guess I didn't see statutory language that actually gives somebody an entitlement to know whether they're on the list. Well, Your Honor, both in Section 44903 twice, in Section 44926, 44909, the Congress said you've got to set up a system, let's just look at what it says in 44926, or 44903 J2GI, Executive Salas, a timely and fair process for individuals identified as a threat to appeal to the TSA the determination to correct any erroneous information. Now, that's the language that we're relying on here. How does an ordinary traveler, U.S. person or foreign national, make a, an appointment to an appeal and ask for the rectification of an erroneous classification on one of these watch lists unless that person knows and is told that she's on the list and some reason why? And that's the reason why cases in other circuits, Your Honors, have ruled that the TSA must comply with this as a matter of due process and under the APA. Now, we suggest With respect to non-citizens? They've held, they've, they've only adjust the new, the, the, the rule with respect to U.S. persons. Right. Okay. However, Your Honor, where does the TSA get the basis, the authorization to distinguish between foreign and U.S. travelers? It's not in the law. In fact, when you look at the legislative history in this case, and particularly a report that the DHS security privacy officer issued in response to a statutory mandate back in 2006, which is the predicate for what happened in the enactment of Section 44926A in 2007, that report stated unequivocally that without any distinction between U.S. person travelers and foreign travelers, that, that the protection, I think I'm quoting now correctly, of a robust, robust and effective appeal procedure is essential as a matter of fundamental due process. And I'm talking about the Fifth Amendment here. I'm talking about basic values that are, that are essential to our American democracy. So there's no basis, I maintain, at all, in the law under which TSA is operating and created the TRIPS system to distinguish between foreign and U.S. travelers. None. And the decision by TSA to adopt such a distinction, in my view, is the height of arbitrariness. This case, Your Honors, will be the first time that a court will specifically be asked to address the issue that I'm putting before you today, that Ms. Mattar is putting before you today. And we ask, Your Honors, that this circuit adopt a rule that makes it clear that TSA was good for the U.S. traveler and the U.S., you know, permanent resident traveler is also good and appropriate for a foreign traveler, and there's nothing in the underlying legislation that requires any different conclusion. I see my time is up. I'll reserve where they remain over it, and I think I've reserved a couple of minutes for rebuttal. Thank you, Your Honors. Mr. Hinchelwood. Good morning, Your Honors. May it please the Court, Branchwood, on behalf of the TSA, I'd like to begin by addressing the threshold issues in this case, both timeliness and standing. Ms. Mattar's standing allegations focus on her purported presence on the no-fly list and the fact that she believes that prevents her from flying to the United States. Those allegations or that assertion is speculative in at least three respects, and the combined effect of that, of the speculative nature of each of those steps, leaves Ms. Mattar with outstanding to press this petition. First, she contends that in 2013, she was advised that she was on a watch list by a Canadian official, and in response to that statement and advised not to enter the United States, and in response to that statement, she canceled her ticket and went back to Israel. So on her own allegations, she's never been denied boarding on a flight. She's never been told she's on the no-fly list, even at that one incident in 2013. In the ensuing five years, she alleges no additional travel difficulties or other challenges that would suggest any injury or any presence on the no-fly list, and since that time, she's gone through the DHS trip redress procedure, and at the conclusion of that procedure, she was informed that DHS, TSA, and other federal agencies had taken appropriate steps to make any necessary corrections to federal records that were brought to light by her redress request, and she has not attempted to fly since that time. So if we put aside the five years and her petition to make use of the trip request, so if we just go back to 2013, and she brought her claim right after she got the advice from the Canadian official, you'd still be arguing that there's no standing? Yes, Your Honor, but the fact is that that alone isn't the issue here. And what would that be based on? Again, the fact, Your Honor, that she's never been told that she's on the no-fly list and has never been denied boarding on a flight. But she was told by a Canadian official. That she was on a list, an unspecified list, and that she was advised not to enter the United States. And she's never alleged that she was actually denied boarding or that she was told she was on the no-fly list, and that alone, Your Honor, I think would undermine standing. Well, is extra screening not enough? Suppose that that happened. Is extra screening not enough to create an injury? Well, Your Honor, those are two different lists. There's a selectee list for individuals who are subject to additional screening, and then there's the no-fly list. And so if the injury, as she's repeatedly alleged, is her inability to fly to the United States, extra screening would not affect. But extra screening could be an injury. Your Honor, perhaps, but that's not presented here, because there's no allegation that she's ever suffered heightened screening, and that would be a separate and distinct injury from the one she's actually claiming in this petition, which is inability to fly to the United States. Well, I'm a little perplexed. You say there is a redress procedure that's in place. Correct, Your Honor. And if a person has some fair indication from, even though it's Canadian, Canadian officials, you're on a no-fly list, and there is a redress procedure in place to assist people, whether it's five years later or not, how can that person not get an answer, at least, that you're not on any list? Well, Your Honor, I want to separate out two separate things. One is, as to standing, that suggestion goes only to whether or not this is a purely procedural harm, which we think it is. The assertion that there is... Just go with my assumption. I think there's standing. Okay? So how does that person not have a right, given the argument you're advancing, which seems to be kind of a ho-hum, what's the big deal here? Well, the big deal is she was told by a government official, albeit Canadian, that she's on a no-fly list. And then when she does get around to asking, and your ho-hum answer is, no one has ever said she's on a list. Well, she asks, am I on a list? That government official says I was. The answer she gets is, we're not telling you anything. Two answers, Your Honor. One, I want to just be clear, she was not told, or allegations are, she was not told whether she was on a no-fly list. She was just told she was on a list. Okay. A list, which the Canadian official said meant you can't fly. Said she was advised not to enter the United States, and whatever that means. Not to fly. Your Honor, certainly ambiguous advice. You know, you really, I think it's a very unreasonable position for the government to suggest what you're, you're quibbling over nonsense. She was told, don't fly. These are average people who are looking to get somewhere, and they're told by an official, no, you can't do this. That means you can't fly.   Well, the answer she gets is, no, you can't fly.    Okay, forget the five years. Now, she asks, am I on a list? She's being responsible. She's assumed she can't fly. Now, she says, I just don't get this. And she asks, why are you so comfortable in saying it's okay for us, in light of the fact that Congress said, set up a redress system, it's okay for us to say, we're not telling you anything? Because, Your Honor, Congress also tasked TSA with protecting transportation security, and specifically aviation security, and delegated authority for the agency to promulgate regulations addressing sensitive security information. TSA has done that here, and it's designated a person's presence or absence on a watch list as being SSI. I don't know. I hear you. I hear you. And you give more to U.S. citizens, which suggests that U.S. citizens can be terrorists, too. So, you've got a little bit of a stumble there, but forget that for the minute. I don't know how that gets you to your comfort level in security as being the answer if you're talking about a person who's not on any list. How does it hurt U.S. security to say to a person who was told, you can't fly, who thinks, I'm on a no-fly list because a government official said so, no, you're not. Now, how does that hurt government security? I mean, just for my edification. Your Honor, it's the same rationale that animates any sort of response of this nature, which is that if an organization, for example, a terrorist organization, were to submit redress requests on behalf of all of its members, they could ascertain which members are or are not on the list. And so, confirming one way or the other necessarily reveals information about what the U.S. government knows or does not know about a particular organization. It's only a situation, hypothetically, where someone has been denied a flight opportunity and is handicapped and wants to know, I don't know what's going on. It's not a terrorist organization sending in a list of 50 people, can you run this one down, tell us who is and is not on the list. It's an individual person who's been denied the right to fly, and there is a redress, and they say, I don't understand what's going on. If the answer is, you're not on any list, I don't understand how that involves security concerns. Again, Your Honor, for the same reasons that any other response of that nature, that any other sort of GLOMAR-type response operates. It would not have promulgated a redress system. I don't believe that's true, Your Honor. And we wouldn't have reached the decision we reached with respect to U.S. citizens and residents that you've got to respond because the law requires a response. Two points, Your Honor. Both the APA and the Constitution. As to U.S. persons, the TSA and DHS promulgated new regulations to address those individuals to address concerns about due process and the Fifth Amendment rights those individuals have. And so the fact that TSA was sensitive to and took action to address concerns of that nature says nothing about the type of process that's due to non-U.S. persons outside the United States who do not have Fifth Amendment rights. Now, and as to whether Congress would have provided for such a thing, the point is that any rights Ms. Vitar has are congressionally conferred, and you have to read them in TSA and DHS to establish this procedure. The procedures, the regulation, excuse me, the statutory text provides for no particular set of procedures that must be followed, and it also comes with a specific delegation to protect information relevant to transportation security, which TSA has done, and a regulation that is not challenged, Your Honor, in this position. It's not a specific delegation to do what you're doing. It's interesting. Agencies always use this argument. We've seen it in the APA cases that are legion, an agency that is not specifically barred from doing something. Agencies assume that means we can do whatever we want to do as long as we're in the general area of concern. That really isn't the law. It's not statutory or constitutional. No, Your Honor, but Section 114R allows TSA to promulgate regulations for protecting this information. What kind of regulations? Any regulations? Regulations to protect information relevant to the nature of transportation security. That would be reasonable? Sure. But if there were a challenge. Reasonable regulations. Your Honor, if there were a challenge to that actual regulation in this petition, then perhaps we could litigate that question and decide whether that's true. You can't challenge the application to a new one. If I have a regulation applied to me, I can't challenge as applied? Your Honor, but that's not the type of challenge that was brought here. There's simply the question is whether under the existing regulations, Ms. Mattar has standing to pursue, timely filed a petition to pursue, and then has any sort of statutory right to necessarily receive not only the sensitive security information about whether or not she is or is not on a list, but also the classified information or petitioned classified information that might underlie any determination if she were, in fact, on a list. And there's no case that holds that the government is required to disclose information of that sort in the course of sort of normal litigation or BAPA. So there's no case that's decided whether or not we're going to apply the same rules to noncitizens that we apply to citizens and residents. Well, Your Honor. That's all you mean to say. Well, Your Honor, certainly there's no. There's no case that goes your way. And the only cases that have been decided go against you to the extent that we've thought about it at all, but we have not yet decided the nonresident case, the noncitizen case. So, Your Honor, all of those cases address U.S. citizens or U.S. persons. Right. And it's certainly not unreasonable for TSA to treat differently situated persons differently. People who have Fifth Amendment rights, TSA has taken steps following litigation to provide additional process to those individuals. There are no constitutional rights is what you're saying. Zero. Not in this circumstance. Correct, Your Honor. No. Wait. Zero. In these circumstances or no whatsoever for noncitizens? In this particular context, as to Ms. Mattar and similarly situated individuals, no. There are no Fifth Amendment due process rights at stake here. So you're saying that noncitizens do have Fifth Amendment rights? No. No, as a general matter. Not ever. Your Honor, there is no case in which No, I'm not talking about the particular situation, which we haven't decided yet. What are you saying about noncitizens? They have no constitutional rights? Unless an individual has come within the territory of this country and established substantial connections, this Court's cases are clear, as the Supreme Court's cases are, that noncitizens do not have Fifth Amendment due process rights. So in this circumstance, Ms. Mattar does not meet that test. She does not have Fifth Amendment due process rights. And the fact that TSA has, in response to concerns raised about due process rights of U.S. persons, taken steps to ameliorate those concerns, does not alter the fundamental statutory scheme under which the redress procedure operates. And that redress procedure operates not only in the context of a very general delegation from Congress about exactly what type of procedure to create, but also specific authorization to promulgate regulations that address sensitive security information, that TSA has exercised that authority in a regulation that, again, is not challenged in the circumstance. And under those circumstances, there's no reason to think that there's any additional process required in this circumstance. Your Honor. Can I ask you about just about timeliness, just to make sure that you have a chance to deal with that? So is it your understanding that timeliness is an issue that can be addressed regardless of standing on the theory that even though under Steele Company you traditionally address jurisdictional issues first, that timeliness is a threshold question like foreign nonconvenience that can be addressed before standing? Correct, Your Honor. Like, we're going to ask, yes. Yeah, okay. So then if we have the authority to address standing, then what about your opponent's submission that you have information within your disposal about when it was sent out? And so it should be incumbent upon you to come up with proof that, in fact, the determination was sent out on the date of the letter. So we do not have any information about when precisely the letter was sent. We just do not have that. And there's nothing in the record. As the record reflects, we don't have that information. So the only question here is who bears the burden in these particular circumstances. And it's certainly the case here that Ms. Vitar had the relevant evidence in her possession at the time she received the letter. And not only that, but had at the time when she received the letter ample remaining time in the 60-day period in which to bring a petition, in fact, acted the next day, had her counsel contact TSA, and then did nothing for slightly over six weeks before filing a petition. So even if you had some concerns about sort of the time landscape here, there's no reason to think that there was any prejudice to Ms. Vitar from the particular delay or from whatever limited delay took place here. Is it right that it was a Friday and look at the calendar to see whether it was a Friday? Was July 28 a Friday? I believe it was, Your Honor, yes. And then do postmarks happen on Saturdays? I mean, I know if I go to the post office, I don't know what the – I don't know. There's nothing in the record. I don't know what the answer is to that question, at least as it applies to TSA and the mailing of this particular notice. Can I ask you to turn to page JA40? Yes, Your Honor. 40? 40. Right. That's the letter. Yes, Your Honor. And if you go to paragraph 3, would the difference be – I just want to be sure I'm clear about this. Would the difference in that response, if she were an American citizen or a lawful permanent resident, would the difference have been instead of saying, DHS TRIP can neither confirm nor deny any information about you, which may be within federal watch lists or reveal any law enforcement-sensitive information. If she had been a U.S. citizen or lawful, they would have told her either, yes, you're on the list, or no, you're not. No, Your Honor. It's actually somewhat more limited than that. The circumstances in which an individual is told are if an individual purchases an airline ticket, is denied boarding, files a redress request in response to the denied boarding, the redress review is completed, and the individual remains on the no-fly list at the conclusion of that review, under those circumstances a U.S. person would receive a letter telling them you are on the list. And that would be all it would say at that time. There would then be further back and forth and the opportunity to eventually receive some information about the reasons why. But at least as to the initial letter, no, it's not generally the case. Not generally the case. It's somewhat similar. What do you mean? You have to be under the unclassified policy statement or whatever it is on page A14. She has to be denied boarding. Correct, Your Honor. And then may be apprised of her status and may inform the applicant of his or her status on the list if she is on the list. Now, if even a U.S. citizen has to be denied boarding before being told or being eligible to be told whether you're on a list or not, that's, I think, significant. But if you go on in this letter, notwithstanding she was not told whether she was on a list or not, she was told we've made any corrections to records that our inquiries deemed were necessary without saying whether they've done it or not, including, as appropriate, notations that may assist in avoiding incidents of misidentification. Then they go on to say, and here's how, if you want to come into the U.S., you do it. First, when you use this redress control number when making your reservations. Now, I don't know whether airlines, I don't know, I don't know if you know, and it's not in the record, whether airlines would take that redress number and stop it at that point or make her reservation for her. She's denied boarding or not denied boarding. But in any event, she's been told of steps she can take. And four years after that, she tried, I think, to get the waiver in 2017, the waiver from a nonimmigrant visa requirement. Isn't that right? You know, there's two separate issues. One is whether, as we pointed out in a separate letter, this injury is redressable based on her recent denial of a visa application. Well, that's the July 18th. That's correct, Your Honor. And prior to that point, she alleges that in 2013 her access or her sort of ability to use the visa waiver program was revoked. But I'm not aware of any allegation that she's attempted to use the visa waiver program since 2013. Okay. So it was the nonimmigrant visa that she was denied this past July. Yes, Your Honor. Okay. A few months ago. Okay. And if there are no further questions. What did you say? A few months ago? Yes, Your Honor. We submitted a letter addressing that. After our brief was filed, Ms. Matar applied for and was denied a B-1, B-2 visa to travel to the United States. And that was based on the fact that there was not sufficient evidence that she would return to her home country. Correct, Your Honor. She couldn't overcome the presumption of immigrant status that an individual is required to overcome. And, again, that decision is not reviewable under the Doctrine of Consular Nonreviewability, but just for the Court's information, it raises concerns about whether this injury could be redressed. Okay. Thank you, Your Honor. All right. Does Mr. Zell have any time left? Mr. Zell has three seconds remaining. All right. I have reviews. I reserve two minutes. Why don't you take two minutes? Thank you. Thank you. A couple points. That visa application really does demonstrate some serious problems with this case. She applied for a visa.  that she was going to return to her children and grandchildren. All I can say is that's suspect, but that's not before the Court today. It's not before the Court. But what is before the Court is pages 44 and 45 of the record. And there, in response to counsel's statement about speculative injuries, is a letter from another component of the Department of Homeland Security called the United States Customs and Border Protection, in response to Ms. Mattara's trip inquiry. And that letter says that ESTA, this is about ESTA, this is the electronic system for travel authorization. ESTA is an automatic system used to determine the eligibility of visitors to travel to the United States under the Visa Waiver Program. And as I mentioned, Ms. Mattara is a Belgian national, and therefore she's eligible for that. ESTA screens, this is important, ESTA screens all applications against security and law enforcement databases so that only those individuals who are found ineligible to travel to the United States or those who travel would pose a law enforcement or security risk or refused a travel authorization. In the next statement, next paragraph, she says, after a careful review of our records, we have determined that your ESTA application was denied as you do not meet program requirements. Now, that isn't an injury, Your Honors. I don't know what is. Now, let me address this other point about security, sensitive security information, SSI, that Congress did talk about in Section 114R of Title 49. Ms. Mattara and others are asking, Your Honors, for the United States to disclose sensitive security information. If we took the TSA's position in this case, I think as Judge Edwards' inquiry or colloquy with counsel demonstrates, there would be no justification for the change, the serious change in procedure that the TSA adopted in response to the litigation in the District of Oregon, Lateef v. Holder, Lateef v. Sessions, and related cases. They changed that, their rule, because the court told them that what they were doing with respect to U.S. persons, at least, was inappropriate under the APA and under the Constitution. And the court said, on balance, the disclosure of this limited amount of information to applicants under the TRIP Program is appropriate, an appropriate balance. Your Honors, I come from Israel. We know what terror is about. We know it every single day of our lives. But we also know what democracy is about. And this country had a lot to teach us about that. And democracy, Your Honors, requires that an appropriate balance be made. You just can't put people on some kind of a watch list because it's convenient for you and you call it security information. You've got to achieve a balance. And the balance is simply what the courts in the Ninth Circuit and the Fourth Circuit have told us. It's simply to tell them, are you on the list, are you not on the list, and some simple, unclassified reason as to why, so that an ordinary person like Ms. Mattar can make a determination that she was erroneously put on a list that stigmatizes her and prevents her from traveling internationally, not only to the United States but around the world, and makes her a tainted person like a terrorist.
judges: Henderson, Srinivasan, Edwards